# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

ALBUQUERQUE PUBLIC SCHOOLS,

      Plaintiff,

v.                                        Civ. No. 18-1029 KK/LF

LINDSAY SLEDGE *et al.,*

      Defendants.

*Consolidated with*

LINDSAY SLEDGE *et al.*,

      Plaintiffs,

v.                                          Civ. No. 18-1041 KK/LF

BOARD OF EDUCATION OF ALBUQUERQUE
PUBLIC SCHOOLS *et al.,*

      Defendants.

## MEMORANDUM OPINION AND ORDER
## REGARDING ALBUQUERQUE PUBLIC SCHOOLS' IDEA BRIEF IN CHIEF

THIS MATTER is before the Court on Albuquerque Public Schools' ("APS") Original Complaint for Review of IDEA Administrative Decision (Doc. 1)[1] ("Complaint"), filed November 6, 2018, and Albuquerque Public School[s'] IDEA Brief in Chief (Doc. 15) ("Appeal Brief"), filed April 1, 2019, both seeking review of the October 7, 2018 Decision of the New Mexico Public Education Department ("NMPED") Due Process Hearing Officer ("DPHO") in *In re Sledge et al. v. Albuquerque Public Schools et al.*, DPH No. 1819-01 ("Decision"). The Court's jurisdiction over APS' Complaint arises under 20 U.S.C. § 1415, which provides that a party aggrieved by a

---

[1] References to "Doc." are to the docket in Civ. No. 18-1029 KK/LF (D.N.M.). References to "Sledge Doc." are to the docket in Civ. No. 18-1041 KK/LF (D.N.M.). By Order entered July 23, 2019, the Court consolidated these actions, however the dockets were not merged. (Doc. 25, Sledge Doc. 31.)

due process hearing officer's decision pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 *et seq.* ("IDEA"), has the right to bring a civil action in federal court without regard to the amount in controversy. 20 U.S.C. § 1415(*i*)(2)-(3).

The Court, having reviewed the entire administrative record and the parties' submissions and being otherwise fully advised, FINDS that: (1) the Decision should be REVERSED to the extent the DPHO concluded that APS failed to offer Student a free appropriate public education ("FAPE") for preschool; but, (2) the Decision should be AFFIRMED to the extent the DPHO concluded that APS failed to offer Student a FAPE for kindergarten and ordered APS to offer Student homebound services with optional socialization opportunities for her kindergarten year. [2]

## I. Facts and Procedural History

P. S.-G. ("Student") was born in 2013. (Doc. 12-7 at 37.) Student has Dravet syndrome and as a result has had life-threatening seizures since infancy. (Doc. 12-3 at 9, 12-14.) Student's physicians have prescribed legal medications to reduce the frequency and duration of her seizures. (*See, e.g.*, *id.* at 12-14, 104, 115.) However, these medications have not always been effective and have caused serious side effects including inconsolable screaming and respiratory depression, and Student often needed emergency medical services when these were the only medications she took. (Doc. 12-3 at 12-14; Doc. 12-7 at 37-40, 65.)

After Student's family moved to New Mexico in 2016, the New Mexico Department of Health ("NMDOH") designated Student as a qualified patient with a debilitating medical condition whose primary caregiver, Defendant Lindsay Sledge ("Mother"), may administer cannabis to her pursuant to the Lynn and Erin Compassionate Use Act, N.M. Stat. Ann. §§ 26-2B-1 *et seq.*

---

[2] Pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have consented to the undersigned to conduct dispositive proceedings and order the entry of final judgment. (Doc. 22; Sledge Doc. 21.)

("CUA").[3]  (Doc. 12-7 at 41-42.)  The administration of cannabidiol ("CBD") three times daily as a maintenance medication,[4] and cannabis oil at the onset of a seizure as a rescue medication,[5] has greatly reduced the frequency and duration of Student's seizures without any serious side effects. (*Id.* at 42, 46.)

In the fall of 2016, APS informed Mother that Student could not receive cannabis on school grounds.  (Doc. 12-7 at 45.)  As a result, Mother requested homebound services for Student from APS preschool IEP specialist Patty Odegard.[6]  (Doc. 12-6 at 7, 9; Doc. 12-7 at 44-45.)  In February 2017, Student's neurologist, Seema Bansal, M.D., completed an APS form entitled "Consideration for Home Bound Placement," on which Dr. Bansal indicated that Student was "unable to function in the school setting, even for a shortened day at this time or for a period totaling 52 weeks during the school year."  (Doc. 12-3 at 80-81.)  In addition, on March 1, 2017, Dr. Bansal wrote a letter to whom it may concern, in which she stated:

> [c]hildren with Dravet syndrome may have prolonged seizures that require medication to stop.  At home, "rescue medications" are used to stop these prolonged seizures.  Generally, the use of rescue medications does not prohibit school attendance, if the school has a nurse or other provider who is comfortable

---

[3] The CUA was amended on April 4, 2019.  2019 N.M. Laws Ch. 247 (S.B. 406) (approved Apr. 4, 2019).  Citations to New Mexico Statutes Annotated § 26-2B-1 and subsequent sections are to the CUA in effect when the DPHO issued the Decision presently on appeal.  The Court does not address the amended CUA in this Memorandum Opinion and Order because it was not in effect at the time the DPHO issued her Decision and neither side has argued that it should apply.

[4] The United States Drug Enforcement Administration recently placed "FDA-approved drugs that contain CBD derived from cannabis and no more than 0.1 percent tetrahydrocannabinols in schedule V" of the federal Controlled Substances Act.  83 Fed. Reg. 48950-02, 2018 WL 4632087 (Sept. 28, 2018).  However, there is no record evidence that the CBD Mother gives Student is an "FDA-approved drug[]."  Rather, the record reflects that at all relevant times there was only one such drug, Epidiolex, and Defendants Sledge and Guba ("Parents") had not yet decided whether to seek a prescription for it due to its high cost and the risk of changing Student's medication regimen.  (Doc. 12-7 at 57-58, 63.)

[5] The cannabis oil Mother gives Student has a 1:1 ratio of CBD to tetrahydrocannabinol ("THC").  (Doc. 12-7 at 64.)

[6] The term "homebound services" refers to services provided in a student's home "by [APS] personnel.  They would include licensed special education teachers and licensed related service providers."  (Doc. 12-8 at 30.)

administering these medications . . . . [Student's] mother states that prescribed rescue medications (rectal diazepam, intranasal midazolam) cause patient [to] be irritable for 24 hours after use. She reports that using CBD oil shortens the duration of the seizure without these side effects. While the number or length of school days can be adjusted for [Student], we cannot predict when or where her seizures may occur. There are no medical barriers to [Student] being in school. Home-bound education, however, will provide an environment in which [Student's] mother is able to provide what she feels is an effective rescue medication.

(Doc. 12-3 at 85.)

APS determined that Student was eligible to receive special education and related services due to her other health impairment ("OHI") of Dravet syndrome, (Doc. 12-3 at 60-61, 74-76), and held a meeting on March 16, 2017 to develop an IEP for her. (Doc. 12-3 at 87-97.) Mother attended the meeting, as did Ms. Odegard and several other APS employees. (*Id.* at 87.) The Prior Written Notice of Proposed Actions ("PWN") generated at the meeting indicates that APS proposed to provide Student with, *inter alia*, Extended School Year ("ESY") services and special education services for one hour per day in a special education preschool classroom, and the IEP team accepted these proposals. (Doc. 12-3 at 96-97.) The PWN further indicates that APS proposed to provide Student with homebound services, but the IEP team rejected this proposal because Student "is able to attend her neighborhood school with accommodations specific to her medical needs."[7] (*Id.* at 96.)

The parties dispute whether Mother agreed with the IEP team's decision that Student should attend preschool in lieu of receiving homebound services. Mother testified that she requested homebound services, but "someone"—either Ms. Odegard or "the homebound

_____

[7] APS contends that the DPHO's Finding of Fact No. 9 is clearly erroneous, (Doc. 15 at 27-28); and, the Court agrees insofar as it mistakenly posits that the March 2017 IEP team rejected homebound services for lack of documentation. (Doc. 12-1 at 395.) The DPHO cited to no record evidence, and the Court has found none, indicating that the team rejected homebound services for this reason.

person"[8]—"said she needed to try school before they went to homebound." (Doc. 12-7 at 45.) Ms. Odegard, in contrast, testified that Mother "did want [Student] to go to school," (Doc. 12-6 at 17-18); and, APS employee Kathleen Barrett testified that Mother was told homebound services were available to Student, but Mother "wanted [Student] in school; and the committee was doing their best to find a way for [Student] to participate, and [Mother] was as well." (Doc. 12-6 at 68, 70.) Also, on the date of the meeting, Mother completed a form entitled "Consent for Initial Special Education Services," on which she indicated: "**I agree** with the recommendations of the IEP team and **do give permission** for my child to receive recommended services."[9] (Doc. 12-4 at 102 (emphases in original).)

Neither Student's written IEP nor the PWN indicates that Mother planned to accompany Student to preschool to remove her from campus and give her cannabis in the event of a seizure. (*See generally* Doc. 12-3 at 87-97.) However, this plan was discussed at the meeting.[10] (Doc. 12-6 at 12-13.) Mother testified that it was APS employee Rochelle Renteria who suggested that Mother accompany Student to preschool, but Ms. Renteria disputed this. (Doc. 12-7 at 45; Doc. 12-8 at 7.) Student's teacher Lisa Boles-Smith and school nurse Dany Mak were aware that

---

[8] The "homebound person" was presumably Kathleen Barrett. (Doc. 12-7 at 45.) Ms. Barrett attended Student's March 2017 IEP to cover for APS' homebound services head teacher. (Doc. 12-6 at 67-68.)

[9] APS submitted this document on August 20, 2018 in preparation for the due process hearing, as page 15 of its Exhibit O. (Doc. 12-4 at 7-10, 102.) It does not appear to have been offered or admitted into evidence at the hearing or relied on by the DPHO in her Decision. However, APS included it in the record of administrative proceedings filed in this case, (*id.*), and Parents have not objected to its inclusion. The Court therefore finds that it may properly consider the document in conducting its modified *de novo* review of the Decision. *Garcia v. Bd. of Educ. of Albuquerque Pub. Sch.*, 520 F.3d 1116, 1125 (10th Cir. 2008).

[10] The DPHO found that at the March 2017 IEP meeting, Mother "stated she had a one[-]hour window in which Student's medication had to be administered." (Doc. 12-1 at 396 (citing Doc. 12-6 at 16, 18).) It is unclear whether the DPHO (or Ms. Odegard, the witness on whose testimony the DPHO relied) was referring to Student's maintenance medication or her rescue medication. Regardless, Mother's testimony at the due process hearing clearly establishes that to be effective, Student's rescue medication of cannabis oil must be administered within two to three minutes of the onset of a seizure. (Doc. 12-7 at 46.)

Mother planned to accompany Student to preschool to remove her from campus and give her cannabis in the event of a seizure. (Doc. 12-6 at 24, 34-35; Doc. 13-1 at 2-3.) At no time did Parents provide Student's school with medication to treat Student's seizures. (Doc. 12-6 at 42; Doc. 12-7 at 65.) Had Parents provided the school with prescription medication, the school nurse could have administered it to Student. (Doc. 12-6 at 50; Doc. 12-7 at 34.)

Student began attending preschool at her neighborhood APS school in March 2017. (Doc. 12-3 at 96, 169; Doc. 12-6 at 20.) For the rest of the 2016-2017 school year and for the ESY of 2017, Mother accompanied Student to preschool and sat in Student's classroom so that she could remove Student from campus and give her cannabis in the event of a seizure. (Doc. 12-6 at 20-21; Doc. 12-7 at 45-46.) Student also attended preschool at her neighborhood APS school for the 2017-2018 school year, and Mother again accompanied Student so that she could remove Student from campus and give her cannabis in the event of a seizure. (Doc. 12-3 at 169; Doc. 12-7 at 46-47.) During this school year, however, Mother waited in her car or in the staff lounge pursuant to Student's teacher's suggestion. (Doc. 12-6 at 20-21, 24, 34-36; Doc. 12-7 at 47.)

Although her IEP called for her to attend preschool only one hour per day, Student often stayed for the full two-and-a-half hours per day. (Doc. 12-3 at 96; Doc. 12-6 at 13, 20, 25; Doc. 12-7 at 46.) Student missed one or two days per week due to her, her siblings', and Mother's appointments and illnesses. (Doc. 12-7 at 45-46, 48.) Despite her frequent absences, Student made good educational progress. (Doc. 12-6 at 39, 62.)

On March 12 and April 2, 2018, APS held a meeting to develop Student's IEP for the 2018-2019 school year, when Student would be attending kindergarten. (Doc. 12-3 at 185-86.) Mother, Ms. Boles-Smith, and several other APS employees attended this meeting. (*Id.*) At the time of

the meeting, Mother was considering homeschooling Student because she felt she could not be at

school with Student

> for six hours, because kindergarten is different than preschool in regards to [Student] missing days. She can't miss several days a week because I have appointments or my other kids have appointments. You know, that won't fly once she is in kindergarten. . . . I can't be here all day, every day, I just can't do that anymore.

(Doc. 12-7 at 50 (quotation marks omitted).) However, Mother wanted Student to receive a public

education and did not want to homeschool her. (*Id.*)

According to the PWN generated at the March/April 2018 IEP meeting, APS proposed that

Student attend full-day kindergarten in a cross-categorical classroom at her neighborhood school

with a one-on-one educational assistant, and the IEP team accepted these proposals. (Doc. 12-3 at

197-98.) The PWN further indicates that APS proposed homebound services for Student, but the

IEP team rejected this proposal because "[a]t this time there is no documentation, medically or

academically, to support [h]omebound services." (Doc. 12-3 at 197; *see also, e.g.*, Doc. 12-6 at

30 (Ms. Boles-Smith testified that homebound services were "brought up" at the meeting); Doc.

12-8 at 4 (special education teacher S. Debban-Solomon testified that homebound services were

discussed at the meeting but "the team" felt a classroom was Student's least restrictive

environment); Doc. 12-8 at 17 (head special education teacher H. Smith-Olson testified that

homebound services were discussed at the meeting but "[i]t did not seem an appropriate placement

for [Student] based on her educational needs").) Mother testified that at the meeting, she told APS

special education principal Lisa Oliphant, "'I sought out homebound and you guys denied it.' So,

you know, we've already been down that road. And it was – you know, [Ms. Oliphant] said

[Student] needed to be in school." (Doc. 12-7 at 57.)

The PWN generated at the March/April 2018 IEP meeting also indicates that Mother proposed an abbreviated schedule for Student, but the IEP team rejected the proposal because "[t]here is no current data that supports the need for an abbreviated schedule at this time." (Doc. 12-3 at 197; *see also, e.g.*, Doc. 12-6 at 31; Doc. 12-7 at 17.) Mother explained that she requested an abbreviated schedule for Student because she could not accompany Student to school all day, every day, nor was she willing to send Student to school without the means to receive cannabis as a rescue medication. (Doc. 12-7 at 50.) Although any APS parent has the right to request half-day kindergarten, Mother testified that she did not know about this right and Ms. Oliphant did not advise her of it. (Doc. 12-7 at 21-23, 53.) Ms. Oliphant confirmed Mother's testimony on this point but added that she told Mother she could reach out to Student's school principal "[a]bout her options."[11] (*Id.*)

APS kept the following health records regarding Student:

(1) a "Health Evaluation Summary" by Joan Gugliotta, R.N., dated August 25, 2016, stating that Student was "on Kep[p]ra[12] and CBD daily . . . and Versed[13] and Cannabis as needed," (Doc. 12-3 at 40);

---

[11] The DPHO noted "several inconsistencies in the testimony of Ms. Oliphant" and found that "[s]he did not present as a credible witness." (Doc. 12-1 at 402.)

[12] Levetiracetam, also known as Keppra, "is used in combination with other medications to treat certain types of seizures in adults and children with epilepsy." https://medlineplus.gov/druginfo/meds/a699059.html (last visited Jun. 4, 2019).

[13] Midazolam, also known as Versed, is used "before medical procedures or before anesthesia for surgery to cause drowsiness, relieve anxiety, and prevent any memory of the event. Midazolam is in a class of medications called benzodiazepines." https://medlineplus.gov/druginfo/meds/a609003.html (last visited Jun. 4, 2019).

(2) a "Medical Examination Form" by Dr. Bansal, dated November 9, 2016, listing Student's medications as levetiracetam, acetazolamide,[14] and CBD, (Doc. 12-3 at 57);

(3) a "Seizure Medical Management Plan" by Mother, dated March 29, 2017, listing Student's medications as Keppra, Diamox, and CBD, (Doc. 12-3 at 108);

(4) two forms entitled "Student Health Action Plan for Staff, Seizure Disorder" by Nurse Mak, dated March 29, 2017 and April 26, 2017, stating that Student was "currently attending school with mom's supervision" and not on medication at school, and instructing staff to "[c]lear path so mom may safely evacuate [Student] off campus" in the event of a seizure, (Doc. 12-3 at 112; Doc. 12-4 at 254);

(5) a "Seizure Medical Management Plan" by Dr. Bansal, dated April 6, 2017, and a "Seizure Action Plan" by Dr. Bansal, dated September 27, 2017, listing midazolam as Student's medication in the event of a seizure, (Doc. 12-3 at 104, 115);

(6) a "Summary of Student Health Logs" indicating that Student had seizures at school on: (a) June 21, 2017, on which date Mother removed her from campus "to take home and administer cannabis"; and, (b) August 29, 2017, on which date Defendant David Guba took Student home, (Doc. 12-3 at 99-100; *see* Doc. 12-6 at 51);

(7) a form entitled "Student Health Action Plan for Staff, Seizure Disorder" by Nurse Mak, dated October 10, 2017, stating that Mother was on school campus while Student was in class and Student was "not on medication at school," and instructing staff to "clear path so mom may safely evacuate [Student] off campus" in the event of a seizure, (Doc. 12-3 at 110); and,

---

[14] Acetazolamide, also known as Diamox, is used "to help control seizures in certain types of epilepsy." https://medlineplus.gov/druginfo/meds/a682756.html (last visited Jun. 4, 2019).

(8) an "Individualized Healthcare Plan" ("IHP") by Nurse Mak, dated March 19, 2018, stating that Student was on Keppra daily at home, "Parent cho[se] not to keep Versed in Health Office as [e]mergency [m]ed[ication]," and there was "[n]o [e]mergency [m]ed[ication] in H[ealth] O[ffice]," and listing as "nursing interventions" to "[c]reate [an] Emergency Evacuation Plan and distribute to classroom staff" and to "[i]nstruct staff in safe emergency care of [Student] during a seizure."[15] (Doc. 12-3 at 200.) This IHP was attached to Student's March/April 2018 IEP. (Doc. 12-3 at 188.)

Nurse Mak testified that there were other IHPs for Student, including one for the 2016-2017 school year. (Doc. 13-1 at 3.) However, she did not describe the contents of these IHPs, and they are not included in the record.[16]

On July 3, 2018, Parents submitted a Request for Due Process Hearing against Local Educational Agency and State Educational Agency ("Request") pursuant to the IDEA. (Doc. 12-1 at 5-22.) Parents' Request identified their "proposed resolution . . . to the extent available" as follows: (1) Student should attend full-time kindergarten and receive cannabis as needed from trained school personnel; (2) APS and the NMPED should work together to extend the CUA's waiver of civil and criminal penalties for the administration of cannabis to qualified students to all school personnel who work with Student during the school year; (3) APS and the NMPED should compensate Mother for the hours she accompanied Student to preschool in 2017 and 2018 at the hourly wage of an educational aide; (4) APS should amend Student's IEP to accurately reflect her

---

[15] Pursuant to this plan, Nurse Mak instructed staff to contact Mother and herself and make a note in a seizure log if Student had a seizure. (Doc. 13-1 at 3.)

[16] The DPHO found that "[t]he school nurse believed there were several IHPs . . . for Student, all designating [Mother] as the person to deal with emergency care." (Doc. 12-1 at 399.) As APS observes, this finding is inaccurate. The IHP in the record does not designate Mother as the person to deal with emergency care. (Doc. 12-3 at 200.) The contents of any other IHPs are unknown. (*See* Doc. 13-1 at 3.)

needs and services; and, (5) APS and the NMPED should pay Parents' attorneys' fees for their Request.[17]  (Doc. 12-1 at 20-21.)  Parents requested similar relief in their Statement on Relief Requested, which they submitted on August 13, 2018.  (Doc. 12-1 at 184-85.)

The DPHO held a three-day hearing on Parents' Request on August 27, August 28, and September 6, 2018.  (Docs. 12-6, 12-7, 12-8.)  At the hearing, Mother testified that she would prefer for Student to attend school and receive cannabis from school personnel in the event of a seizure.  (Doc. 12-7 at 59-61.)  Mother further testified that she did not know what the next best alternative would be, and that she would consider homebound services but would prefer for Student to be in school, because socialization is important for the development of Student's social and language skills.  (*Id.* at 60-61.)  Mother stated that she had not yet decided what she was going to do about Student's education because the outcome of the hearing could change her decision.  (*Id.* at 60.)  According to Mother, at the time of the hearing, Student was receiving CBD, acetazolamide, and clonidine[18] daily, and cannabis and very infrequently Versed as rescue medications.  (Doc. 12-7 at 64.)  At the time of the hearing, Student was not attending kindergarten, although she was enrolled at her neighborhood APS school.  (Doc. 12-6 at 48; Doc. 12-7 at 56.)  Mother testified that she was trying to homeschool Student but was "not equipped to teach her." (Doc. 12-7 at 56.)

APS executive director of special education Cindy Soo Hoo testified at the hearing that she knew of a student who received homebound services and also attended her neighborhood school

---

[17] Parents also proposed that APS should evaluate Student and convene a Multidisciplinary Evaluation Team to determine whether Student is eligible for special education services as a student with autism.  (Doc. 12-1 at 21.) Neither side has appealed the DPHO's findings, conclusions, or orders regarding this issue.

[18] Clonidine is used, *inter alia*, "to control symptoms of attention deficit hyperactivity disorder . . . in children." https://medlineplus.gov/druginfo/meds/a682243.html (last visited Jun. 5, 2019).

for some instruction.[19] (Doc. 12-8 at 30.) Ms. Soo Hoo also testified that APS would be "available [sic] to provide homebound services to [Student] so that she continues to receive the services that she is needing and [to] address the parent's concern for the administration of medical cannabis." (Doc. 12-8 at 39.)

In their Proposed Findings of Fact and Conclusions of Law, submitted on October 2, 2018, Parents sought an order: (1) requiring APS to make homebound services available to Student for at least half-days and to allow Student to attend school as Parents see fit for socialization; (2) declaring that APS and the NMPED denied Student a FAPE during the 2016-2017, 2017-2018, and 2018-2019 school years; (3) reimbursing Mother for the hours she accompanied Student to preschool at the hourly wage of an educational aide; (4) requiring the NMPED to "develop guidance" for local educational agencies to the effect that children who are eligible for services under the IDEA and qualified to receive cannabis under the CUA are entitled to a FAPE in the least restrictive environment ("LRE") that does not rely on parent attendance; and, (5) declaring that the CUA conflicts with the IDEA and deprives students of their right to receive a FAPE in the LRE.[20] (Doc. 12-1 at 303-04.)

On October 7, 2018, the DPHO issued a final written Decision in which she made findings of fact and reached conclusions of law. (Doc. 12-1 at 386-413.) *Inter alia*, the DPHO concluded that "[g]iven the child's need for medication that the school cannot legally administer," Student's

---

[19] According to the DPHO, Ms. Soo Hoo testified that "a hybrid program could be made available to Student using homebound services and some limited attendance in the school setting so that Student could socialize with peers." (Doc. 12-1 at 398.) The DPHO cited to no record evidence, and the Court has found none, supporting this description of Ms. Soo Hoo's testimony.

[20] Parents also sought an order finding that APS denied Student a FAPE by failing to evaluate her for autism, and requiring APS to reimburse Parents for the private evaluation they obtained. (Doc. 12-1 at 304.) Again, neither side has appealed the DPHO's findings, conclusions, or orders regarding this issue.

LRE is "the homebound setting with socialization opportunities." (Doc. 12-1 at 410-11.) The DPHO further concluded that APS' "failure to provide Student with the IDEA required continuum of services denied Student FAPE." (*Id.* at 411.) The DPHO also concluded that "[t]he presence of Parent on campus to be available in the event of a seizure was a *de facto* requirement of Student's IEP,"[21] but "[t]here is no evidence supporting Parent's request for payment for the time she spent at school." (*Id.* at 410.)

Based on her findings and conclusions, the DPHO ordered that:

1.      [APS] shall conduct . . . an IEP meeting . . . to provide Parent with the option of a hybrid, homebound kindergarten placement, with related services provided either at school or in the home. Some additional time but not less than three hours per week, at times determined by the IEP team will be offered at the school so that Student may interact with peers. Mother may attend school during these . . . times, at her option, but she is not required to.

2.      In the alternative, Student may attend a half-day kindergarten school day.

3.      In the event Parent chooses to have the school nurse administer Epidiolex during the time Student attends school, [the NMPED] shall work with the [NMDOH] to have that medication, as prescribed by a physician and supplied by Parent, available within 30 days of Parent's election to utilize this medication.

(Doc. 12-1 at 411-12.)

APS filed this civil action on November 6, 2018, seeking reversal of certain findings of fact and conclusions of law in the DPHO's Decision, judgment wholly in its favor, and an award of costs. (Doc. 1 at 7-8.) In its Complaint, APS alleges that the DPHO erred in: (1) exercising jurisdiction over issues related to medical cannabis; (2) finding that APS rejected Parents' requests

---

[21] According to the DPHO, "[o]nce homebound services were denied and [APS'] position was that cannabis could not be delivered to Student on school grounds, little choice was left to Parent but to attend preschool with her 3-year-old child so she could administer her preferred treatment and have Student receive the education she is entitled to under IDEA. It was not a requirement of [APS], *per se*, maybe more of the only alternative given the options." (Doc. 12-1 at 405.)

13

for homebound services at the March 2017 and March/April 2018 IEP meetings; (3) finding that all of Student's IHPs designated Mother as the person to deal with Student's emergency care; (4) concluding that Student's LRE is the homebound setting; (5) concluding that Mother's presence on campus was a *de facto* requirement of Student's IEP; (6) concluding that APS' PWNs regarding Student were incomplete because they did not indicate that Mother had to be on campus in the event of a seizure; (7) concluding that Parents met their burden of proving that Student needs cannabis to treat her seizure disorder; and, (8) concluding that APS denied Student a FAPE. (Doc. 1 at 6-7.) APS also alleges that "the IDEA does not require a school district to accommodate the use of an illegal substance to provide a FAPE." (*Id.* at 7.)

APS filed its Appeal Brief on April 1, 2019, (Doc. 15); Parents filed their IDEA Response Brief on April 22, 2019, (Doc. 20); and, APS filed its Reply to Defendants' IDEA Response Brief on May 3, 2019. (Doc. 24.) As explained herein, the Court finds that certain of the DPHO's findings of fact and conclusions of law should be reversed, but that the DPHO properly exercised jurisdiction over Parents' Request, found that APS denied Student a FAPE in violation of the IDEA for her kindergarten year, and ordered APS to offer Student homebound special education and related services with the opportunity for limited school attendance at Parents' option. The Court will therefore affirm the remedy the DPHO ordered against APS.

## II. Analysis

### A. Standard of Review

"The IDEA sets up a unique standard for a federal court's review of [an] administrative due process hearing." *L.B. ex rel. K.B. v. Nebo Sch. Dist.*, 379 F.3d 966, 973 (10th Cir. 2004). "Unlike the deferential review typically afforded to administrative adjudication of statutory claims, Congress requires district courts to apply a modified *de novo* standard when reviewing agency

disposition in the IDEA context." *Garcia v. Bd. of Educ. of Albuquerque Pub. Sch.*, 520 F.3d 1116, 1125 (10th Cir. 2008); *Sytsema ex rel. Sytsema v. Acad. Sch. Dist. No. 20*, 538 F.3d 1306, 1311 (10th Cir. 2008). Pursuant to this standard of review,

> the district court must (1) receive the record of the administrative proceedings, (2) hear additional evidence at the request of a party,[22] and (3) base its decision on the preponderance of evidence. At the same time, though the statute specifies that review is *de novo,* the Supreme Court has interpreted the requirement that the district court receive the administrative record to mean that due weight must be given to the administrative proceedings, the fact findings of which are considered *prima facie* correct.

*Garcia*, 520 F.3d at 1125 (citations and quotation marks omitted). "The district court's proceedings must maintain the character of review and not rise to the level of a *de novo* trial." *L.B. ex rel. K.B.*, 379 F.3d at 974 (citations omitted).

## B.     Statutory Framework

The IDEA "offers States federal funds to assist in educating children with disabilities." *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, — U.S. —, 137 S. Ct. 988, 993 (2017). "In exchange for the funds, a State pledges to comply with a number of statutory conditions," including the provision of a FAPE to all eligible students residing in the State. *Id.*; *Sytsema*, 538 F.3d at 1312 ("[S]tates must provide all eligible students with a FAPE to receive federal funding under the IDEA."); *L.B. ex rel. K.B.*, 379 F.3d at 974 ("States must comply with the IDEA's requirements, including providing each disabled child with a FAPE . . . in order to receive funds under the statute."). An eligible student "acquires a substantive right to such an education once a State accepts the IDEA's financial assistance." *Fry v. Napoleon Cmty. Sch.*, — U.S. —, 137 S. Ct. 743, 749 (2017) (quotation marks omitted).

---

[22] Neither side has asked the Court to hear additional evidence in this case. (*See generally* Docs. 1, 15, 20, 24.)

A FAPE includes both "special education" and "related services." *Endrew F.*, 137 S. Ct. at 994. "Special education" is "specially designed instruction . . . to meet the unique needs of a child with a disability, including . . . instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings," 20 U.S.C. § 1401(29), while "related services" are the support services "required to assist a child . . . to benefit from" that instruction. 20 U.S.C. § 1401(26). A FAPE must provide a "substantively adequate program of education," which requirement is satisfied "if the child's IEP sets out an educational program that is reasonably calculated to enable the child to receive educational benefits." *Endrew F.*, 137 S. Ct. at 995-96, 999. In addition, a FAPE must be free, that is, "provided at public expense, under public supervision and direction, and without charge." 20 U.S.C. § 1401(9)(A); *Florence Cty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 13 (1993). Finally, a FAPE must be offered in the least restrictive environment that is appropriate under the circumstances. *L.B. ex rel. K.B.*, 379 F.3d at 976.

The IDEA requires special education and related services to conform to the student's IEP, which "describe[s] the special education and related services that will be provided." *Endrew F.*, 137 S. Ct. at 994 (quotation marks and ellipses omitted).

> Parents and guardians play a significant role in the IEP process. They must be informed about and consent to evaluations of their child under the Act. Parents are included as members of IEP teams. They have the right to examine any records relating to their child, and to obtain an independent educational evaluation of their child. They must be given written prior notice of any changes in an IEP, and be notified in writing of the procedural safeguards available to them under the Act[.]

*Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 53 (2005) (citations, quotation marks, and brackets omitted).

When parents and educators disagree about the contents of a student's IEP, "parents may turn to dispute resolution procedures established by the IDEA," including "a due process hearing

before a state or local educational agency."[23]  *Endrew F.*, 137 S. Ct. at 994; *Sytsema*, 538 F.3d at 1312.  The party seeking relief bears the burden of persuasion at the due process hearing.  *Schaffer*, 546 U.S. at 51.  "[A]t the conclusion of the administrative process, the losing party may seek redress in state or federal court."  *Endrew F.*, 137 S. Ct. at 994 (citations and quotation marks omitted); *Sytsema*, 538 F.3d at 1312.  Bearing in mind the modified *de novo* standard of review, the reviewing court must conduct a two-step inquiry for assessing liability:

> (1) Has the school district complied with the procedures set forth in [the] IDEA?
> (2) Are the special education services provided to the student reasonably calculated to enable the child to receive educational benefits—or in other words, has the school district fulfilled its obligation to provide the student with a FAPE?[24]

*Garcia*, 520 F.3d at 1125.  If the court finds that a school district has denied an eligible student a FAPE, it may grant such discretionary equitable relief as it deems appropriate.  *Florence Cty. Sch. Dist. Four*, 510 U.S. at 12, 15-16; *Garcia*, 520 F.3d at 1128.

**C.      APS' Claims for Relief**

In its Appeal Brief, APS relies on two broad claims, *i.e.*, that: (1) the DPHO lacked jurisdiction to determine that an illegal substance was required for Student's FAPE; and, (2) the DPHO erred in concluding that APS denied Student a FAPE and ordering it to offer Student homebound services.  (Doc. 15 at 13, 20.)

1.      The DPHO properly exercised jurisdiction over Parents' Request.

---

[23] In New Mexico, the state educational agency, *i.e.*, the NMPED, holds due process hearings under the IDEA.  *See* N.M. Admin. Code § 6.31.2.13(I).

[24] Regarding the first step, "[a]n IEP's failure to clear all of the Act's procedural hurdles does not necessarily entitle a student to relief for past failures by the school district."  *Sytsema*, 538 F.3d at 1313.  Rather, a school district's failure to comply with procedural requirements entitles a student to substantive relief "only where the procedural inadequacy results in an effective denial of a FAPE."  *Id.; cf. Garcia*, 520 F.3d at 1125 (plaintiff may be entitled to "an order mandating prospective compliance" where school district has failed to comply with a procedural requirement of the IDEA).  In the present matter, the DPHO found that APS' procedural errors did not rise to the level of a denial of a FAPE.  (Doc. 12-1 at 410-11.)  Neither side has appealed this determination.

APS first claims that the DPHO lacked subject matter jurisdiction over Parents' Request. (Doc. 15 at 13-20.)  An adjudicator has subject matter jurisdiction over an action if it has the authority to adjudicate the type of controversy involved.  *Henderson v. United States*, 517 U.S. 654, 672 & n.19 (1996); *see also Radil v. Sanborn W. Camps, Inc.*, 384 F.3d 1220, 1224 (10th Cir. 2004) ("Subject-matter jurisdiction involves a court's authority to hear a given type of case.").  A due process hearing officer's authority to adjudicate controversies arises under the IDEA, which provides that a state educational agency receiving IDEA funds "shall establish and maintain procedures . . . to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a [FAPE]."  20 U.S.C. § 1415(a).  The required procedures include "[a]n opportunity for any party to present a complaint . . . with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a [FAPE] to such child[.]"  20 U.S.C. § 1415(b)(6).  Moreover, "the parents or the local educational agency involved in such complaint shall have an opportunity for an impartial due process hearing, which shall be conducted by the State educational agency . . . ."  20 U.S.C. § 1415(f)(1)(A).  Thus, under the IDEA, a due process hearing officer has jurisdiction over "any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a [FAPE] to such child."  *Chavez ex rel. M.C. v. N.M. Pub. Educ. Dep't*, 621 F.3d 1275, 1282 (10th Cir. 2010) (quotation marks and emphasis omitted).

The record in this case emphatically demonstrates that, from Student's initial March 2017 IEP meeting to the present, Parents have sought to identify and obtain a FAPE for Student in light of her OHI of Dravet syndrome.  As their Request reflects, Parents would prefer for that FAPE to include the administration of cannabis to Student by school personnel as a related service. However, as Student's IEPs and PWNs and Parents' Proposed Findings of Fact and Conclusions

of Law show, Parents have proposed other educational placements and services for Student as well, including homebound services, an abbreviated school schedule, an autism evaluation, and amendment of her IEP. On their face, then, Parents' claims relate to Student's educational placement and the nature of the FAPE to which she is entitled, and fall within the type of controversy the DPHO had the authority to adjudicate and thus within her subject matter jurisdiction. *Id.*

APS argues that the DPHO nevertheless lacked jurisdiction over Parents' Request because she lacked the authority to determine that cannabis, an illegal substance, was required for Student's FAPE. (Doc. 15 at 13-20.) Parents on the other hand claim that Student received cannabis "legally" under the CUA and receipt of the drug was thus proper for inclusion in her FAPE under the IDEA. (Doc. 20 at 15.) As the following discussion demonstrates, while the Court agrees with APS that the IDEA cannot require the administration of cannabis to be included in a student's FAPE, this does not divest the DPHO of subject matter jurisdiction to adjudicate the issue in determining whether APS offered Student a FAPE under the IDEA.

With one exception not applicable here, the possession, use, and distribution of cannabis for any reason are criminalized under federal law. 21 U.S.C. § 812(b)(1) & Sch. I; *see, e.g.*, *Gonzales v. Raich*, 545 U.S. 1, 14 (2005) ("By classifying marijuana as a Schedule I drug, . . . the manufacture, distribution, or possession of marijuana became a criminal offense, with the sole exception being use of the drug as part of a Food and Drug Administration preapproved research study."); *James v. City of Costa Mesa*, 700 F.3d 394, 396 (9th Cir. 2012) (use of medical marijuana is "prohibited by the federal Controlled Substances Act"); *Carlson v. Charter Commc'ns, LLC*, No. CV 16-86-H-SEH, 2017 WL 3473316, at *3 (D. Mont. Aug. 11, 2017), *aff'd*, 742 F. App'x 344 (9th Cir. 2018) ("Federal law still prohibits the use of marijuana, even if possessed pursuant

to state-approved medical marijuana programs.") (ellipses omitted); *Krumm v. Holder*, No. 13-CV-0562 RB/SMV, 2014 WL 11497804, at *1 (D.N.M. Mar. 19, 2014), *aff'd,* 594 F. App'x 497 (10th Cir. 2014) ("Marijuana is classified under Schedule I of the Controlled Substances Act . . . , thus its use and possession are criminalized under federal law.") (citations omitted). And there is no exemption under federal law allowing for medical use. *Gonzales*, 545 U.S. at 27-28. [25]

That the CUA permits Mother to give Student cannabis does not change the fact that federal law prohibits it, nor does it render this fact "irrelevant" as Parents assert. (Sledge Doc. 17 at 7.) "The Supremacy Clause unambiguously provides that if there is any conflict between federal and state law," federal law preempts state law.[26] *Gonzales*, 545 U.S. at 29; *see also Forest City*

---

[25] Like the Ninth Circuit, this Court "recognize[s] that the federal government's views on the wisdom of restricting medical marijuana use may be evolving. . . . But for now Congress has determined that . . . marijuana is unacceptable for medical use." *James v. City of Costa Mesa*, 700 F.3d 394, 403 (9th Cir. 2012).

[26] "There are three types of preemption: express preemption, field preemption, and conflict preemption." *Forest City Residential Mgmt., Inc.*, 71 F. Supp. 3d at 726. Express preemption applies if Congress explicitly provides for preemption in a federal statute, *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992), while field preemption

> can be inferred from a framework of regulation so pervasive that Congress left no room for the States to supplement it or where there is a federal interest so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.

*Arizona v. United States*, 567 U.S. 387, 399 (2012) (quotation marks and ellipses omitted). Finally, "conflict preemption" applies "where it is impossible . . . to comply with both state and federal requirements, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Sprietsma v. Mercury Marine, a Div. of Brunswick Corp.*, 537 U.S. 51, 64–65 (2002) (citation and quotation marks omitted); *Forest City Residential Mgmt., Inc.*, 71 F. Supp. 3d at 726-27; *Emerald Steel Fabricators, Inc. v. Bureau of Labor & Indus.*, 230 P.3d 518, 527-28 (Or. 2010).

The federal Controlled Substances Act ("CSA") "does not contain an express preemption provision." *Forest City Residential Mgmt., Inc.*, 71 F. Supp. 3d at 727. Further, Congress indicated that it did not intend for field preemption to apply to the CSA:

> [n]o provision of this subchapter shall be construed as indicating an intent on the part of the Congress to occupy the field in which that provision operates, including criminal penalties, to the exclusion of any State law on the same subject matter which would otherwise be within the authority of the State, unless there is a positive conflict between that provision of this subchapter and that State law so that the two cannot consistently stand together.

21 U.S.C. § 903. Thus, whether the CSA preempts the CUA must be analyzed pursuant to conflict preemption principles. *Forest City Residential Mgmt., Inc.*, 71 F. Supp. 3d at 727.

*Residential Mgmt., Inc. ex rel. Plymouth Square Ltd. Dividend Hous. Ass'n v. Beasley*, 71 F. Supp. 3d 715, 727 (E.D. Mich. 2014) ("In situations where there is a conflict between state and federal law, it is well-established that the state laws are 'without effect.'"); *Vialpando v. Ben's Automotive Services*, 2014-NMCA-084, ¶15, 331 P.3d 975, 979 (Acknowledging that "the Supremacy Clause dictates that any conflict between the [CUA] and the CSA would be resolved in favor of the CSA.").

There are two alternate problems with Parents' claim that Student received cannabis "legally" such that receipt of the drug was proper for inclusion in her FAPE under the IDEA. (Doc. 20 at 15.) First, the CUA in effect at the relevant time arguably did not purport to make the possession, distribution, or use of cannabis lawful, but rather merely extended immunity to qualified patients and their primary caregivers from state law civil or criminal penalties for cannabis possession, distribution, or use in compliance with the CUA.[27] The operative provisions of the statute support this interpretation, providing that

> [a] qualified patient shall not be subject to arrest, prosecution or penalty in any manner for the possession of or the medical use of cannabis if the quantity of cannabis does not exceed an adequate supply. . . . A qualified patient's primary caregiver shall not be subject to arrest, prosecution or penalty in any manner for the possession of cannabis for medical use by the qualified patient if the quantity of cannabis does not exceed an adequate supply.[28]

---

[27] Cannabis is categorized as a Schedule I controlled substance under New Mexico law, NMSA 1978, § 30-31-6(C), and it is otherwise unlawful for a person to possess a Schedule I controlled substance or drug paraphernalia in New Mexico, NMSA 1978, §§ 30-31-23, 30-31-25.1. Under the CUA, however, qualified patients and licensed producers are exempt from state prosecution for possession of cannabis or paraphernalia. NMSA 1978, § 26-2B-4; N.M.A.C. 7.34.3.25(A).

[28] Notably, the CUA in effect at the relevant time prohibited the possession or use of cannabis on school grounds and did not extend a waiver of civil or criminal penalties to school staff who administered cannabis to qualified students. N.M. Stat. Ann. §§ 26-2B-4, 26-2B-5(A)(3). Nor did it extend a waiver of civil or criminal penalties to practitioners for prescribing cannabis; rather, practitioners could only "recommend" the use of cannabis and provide "written certification" for such use. N.M. Stat. Ann. §§ 26-2B-3, 26-2B-4.

N.M. Stat. Ann. § 26-2B-4(A), (B). The CUA in effect at the relevant time did *not* provide that qualified patients' and primary caregivers' possession, distribution, or use of cannabis in compliance with the Act was "lawful." *Id.*

Interpreted in this limited way, the CUA would not conflict with the CSA and thus would not be preempted.

> [S]everal state courts have held that state medical marijuana laws do not conflict with the CSA because the state laws merely provide limited state-law immunity from prosecution if individuals choose to engage in state-law compliant medical marijuana use. These courts have found that the state law does not present an obstacle to the accomplishment of the federal law and does not deny the federal government the ability to enforce the [CSA's] prohibition [of marijuana].

*Garcia v. Tractor Supply Co.*, 154 F. Supp. 3d 1225, 1229–30 (D.N.M. 2016) (citations omitted). It was possible to comply with both the CSA and the CUA in effect at the relevant time by simply refraining from possessing, using, or distributing cannabis; the CUA did not *require* anyone to engage in such conduct.

Conversely, the CUA would stand as an obstacle to the accomplishment and execution of Congress' full purposes and objectives if interpreted to make lawful precisely what the CSA makes unlawful. *Sprietsma*, 537 U.S. at 64–65; *Forest City Residential Mgmt., Inc.*, 71 F. Supp. 3d at 726-27; *Emerald Steel Fabricators, Inc.*, 230 P.3d at 527-29; *see also Krumm*, 2014 WL 11497804 at *3 ("The CSA does not contemplate that state legislatures' determinations about the use of a controlled substance can be used to bypass the CSA's rescheduling process."). Thus, if interpreted as Parents wish, the CUA in effect at the relevant time would be preempted and without effect, and again, would not change the fact that the administration of cannabis to Student violates federal law. In sum, the administration of cannabis to Student has at all relevant times been unlawful, either because the CUA does not conflict with the CSA but merely extends limited state law immunity to qualified patients and their caregivers, or because the CSA preempts the CUA.

Because the administration of cannabis to Student violates federal law regardless of which interpretation of the CUA is correct, the Court need not choose between them.

Turning to Parents' argument that the CUA required APS to accommodate the administration of medical cannabis to Student, the Court finds that the IDEA, a federal statute, cannot reasonably be interpreted to require APS to accommodate a federal crime to satisfy its obligation to provide Student with a FAPE; such a result would be absurd.

> Frequently words of general meaning are used in a statute, words broad enough to include an act in question, and yet a consideration of the whole legislation, or of the circumstances surrounding its enactment, or of the absurd results which follow from giving such broad meaning to the words, makes it unreasonable to believe that the legislator intended to include the particular act.

*Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 454 (1989) (brackets omitted). The Court recognizes that a school district's obligation to provide special education and related services to eligible students under the IDEA is distinct from, for example, an employer's obligation to reasonably accommodate a disabled employee, or a landlord's obligation to reasonably accommodate a disabled tenant in the provision of publicly funded housing.

Nevertheless, the Court finds analogous and instructive the caselaw cited by APS holding that statutes requiring reasonable accommodation of qualified individuals' disabilities do not require the accommodation of medical cannabis use. *See, e.g.*, *James*, 700 F.3d at 397 n.3 ("[T]he ADA does not protect medical marijuana users who claim to face discrimination on the basis of their marijuana use.") (emphasis omitted); *Garcia*, 154 F. Supp. 3d at 1229 (New Mexico Human Rights Act did not require employer to accommodate disabled employee's medical marijuana use under the CUA); *Forest City Residential Mgmt., Inc.*, 71 F. Supp. 3d at 730 (Fair Housing Act did not require apartment manager to accommodate disabled tenant's medical marijuana use in publicly funded housing); *Curry v. MillerCoors, Inc.*, No. 12-CV-02471-JLK, 2013 WL 4494307,

at *3 (D. Colo. Aug. 21, 2013) (state anti-discrimination law did not shield disabled employee from termination for medical marijuana use); *Emerald Steel Fabricators, Inc.*, 230 P.3d at 520 (state employment discrimination laws did not require employer to accommodate disabled employee's medical marijuana use); *but see Barbuto v. Advantage Sales & Mktg.*, 78 N.E.3d 37, 47-48 (Mass. 2017) (reversing dismissal of employee's state law disability discrimination claim because employee's medical marijuana use in compliance with state law was not "facially unreasonable as an accommodation").  As the *Garcia* court explained, "the fact that the state may exempt medical marijuana users from the reach of the state criminal law does not mean that the state can affirmatively require employers to accommodate what federal law specifically prohibits." *Garcia*, 154 F. Supp. 3d at 1230.

Moreover, Congress passed the IDEA pursuant to its spending power,[29] *Arlington Central School District Board of Education v. Murphy*, 548 U.S. 291, 295 (2006); *Chavez ex rel. M.C.*, 621 F.3d at 1277, and

> [t]he legitimacy of Congress' power to legislate under the spending power . . . rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.' ... Accordingly, if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously.

*Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 207 n.26 (1982) (citing *Pennhurst State School v. Halderman*, 451 U.S. 1, 17 (1981)).  However, the IDEA does not unambiguously require states or their school districts to offer students special education or related services that violate federal criminal law.  Thus, to read this requirement into the IDEA would raise a serious doubt about the statute's constitutionality, while construing the statute to exclude such a requirement would fairly avoid the question.  *See, e.g., Nielsen v. Preap*,

---

[29] The Spending Clause of the United States Constitution provides that "Congress shall have Power . . . to pay the Debts and provide for the . . . general Welfare of the United States."  U.S. Const. art. I, § 8, cl. 1.

— U.S. —, 139 S. Ct. 954, 971 (2019) ("[W]hen a serious doubt is raised about the constitutionality of an act of Congress, [the] Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.") (quotation marks and ellipses omitted).

Also, if further reason were needed, the Court agrees with APS that the IDEA does not require it to administer or accommodate the administration of cannabis to Student because the administration of cannabis cannot be a "related service." (Doc. 9 at 8-9); 20 U.S.C. § 1401(9), (26)(A). To qualify as a related service under the IDEA, the service at issue must be "necessary to aid a [disabled] child to benefit from special education." *Irving Indep. Sch. Dist. v. Tatro*, 468 U.S. 883, 894 (1984); *see* 20 U.S.C. § 1401(26)(A) ("related services" means "supportive services . . . as may be required to assist a child with a disability to benefit from special education"). In general, the administration of medication can be a related service under the IDEA. *John A. v. Bd. of Educ. for Howard Cty.*, 929 A.2d 136, 148-49 (Md. 2007); *see* 34 C.F.R. § 300.34 (related services "include school health services and school nurse services"). However, in the CSA, Congress conclusively determined that cannabis "has a high potential for abuse" and "no currently accepted medical use in treatment," and that there is "a lack of accepted safety for use of the drug," even "under medical supervision." 21 U.S.C. § 812(b)(1) & Sch. I; *see also United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 491 (2001) ("[F]or purposes of the [CSA], marijuana has no currently accepted medical use at all.") (quotation marks omitted). Notwithstanding the passage of state statutes like the CUA, to date, Congress has not revisited these legislative determinations. Thus, if the Court were to interpret the IDEA to include the administration of cannabis to students as a medically necessary related service, such interpretation

would conflict with Congress' legislative determination in the CSA that cannabis has no accepted medical use at all.

> Where "two Acts of Congress allegedly touch[] on the same topic," courts are
>
> not at liberty to pick and choose among [them] and must instead strive to give effect to both. A party seeking to suggest that two statutes cannot be harmonized, and that one displaces the other, bears the heavy burden of showing a clearly expressed congressional intention that such a result should follow. The intention must be clear and manifest.

*Epic Sys. Corp. v. Lewis*, — U.S. —, 138 S. Ct. 1612, 1624 (2018) (citations, quotation marks, and brackets omitted); *WildEarth Guardians v. Nat'l Park Serv.*, 703 F.3d 1178, 1189 (10th Cir. 2013) ("When two related statutes appear to conflict, courts have a duty to construe them harmoniously and give each effect. The intention of the legislature to repeal must be clear and manifest.") (citation and quotation marks omitted).

Here, Parents have made no showing of any congressional intention, much less a "clear and manifest" one, for the IDEA to displace the CSA by including the administration of cannabis to students as a medically necessary related service. *Id.* As such, the Court must construe the IDEA and the CSA harmoniously and give effect to both, by holding that the CSA operates to exclude the administration of cannabis from being a related service under the IDEA.[30] That the CSA's cannabis prohibition is more specific and the IDEA's provisions regarding related services are more general reinforces the Court's conclusion on this point. *See WildEarth Guardians*, 703 F.3d at 1189 ("Normally when two statutes conflict, we interpret the more specific statute as an exception to the more general statute."); *see also United States v. Porter*, 745 F.3d 1035, 1049 (10th Cir. 2014) ("[W]here there is no clear intention otherwise, a specific statute will not be

---

[30] The DPHO did, as APS contends, implicitly find that Student needs cannabis. (*See, e.g.*, Doc. 12-1 at 411 (referring to "the child's need for medications that the school cannot legally administer").) To the extent this is a legal conclusion that the administration of cannabis is necessary to assist Student to benefit from special education under the IDEA, the CSA forecloses it. 21 U.S.C. § 812(b)(1) & Sch. I.

controlled or nullified by a general one."). For all of the above reasons, the Court finds that the IDEA does not require APS to administer or accommodate the administration of cannabis to satisfy its obligation to provide Student with a FAPE.

None of the foregoing vindicates APS' argument that the DPHO lacked jurisdiction to adjudicate these issues in determining whether APS offered Student a FAPE under the IDEA, however. APS has pointed to no authority supporting its position that a hearing officer lacks subject matter jurisdiction over a parent's request for a due process hearing simply because the parent is not, on the merits, entitled to the equitable relief she proposes. APS does cite to *John A.*, 929 A.2d at 148-149, but that decision stands for a different proposition and is inapposite here. The parents in *John A.* refused to allow the school nursing staff to communicate directly with the student's prescribing physician to obtain "clarification . . . concerning the administration of [the student's] medications when possible symptoms contraindicating further drug administration were noted." *Id.* at 144-45. The school nursing staff refused to continue administering student's medications after the state's board of nursing advised them "that rote administration of the medications without the ability to communicate directly with the prescribing psychiatrist would be inappropriate." *Id.* at 145. The parents submitted a request for an IDEA due process hearing, alleging that the school nursing staff's refusal to administer the medications without clarification from the student's physician denied the student a FAPE. *Id.* An administrative law judge ("ALJ") subsequently dismissed the parents' request for lack of jurisdiction. *Id.* at 146.

The *John A.* court affirmed the ALJ's decision, holding that the parties' dispute did not sufficiently concern

> a "related service" within the contemplation of the regulatory scheme. The dispute in this case is not so much over the administration of medications to a child, which the [school] concedes is deemed generally a "related service" contemplated by the IDEA, but instead relates to the ability of a child's parents to regulate

communications between the school personnel designated to administer the drugs and the child's treating/prescribing psychiatrist. . . . The dispute in this case involves a medical treatment issue, not a special education one.

*Id.* at 152. The court added that "[h]ad the [the school] refused flatly to administer the medications under any circumstances, and [the student] needed the medications to benefit from her special education, subject matter jurisdiction over such a dispute likely would exist." *Id.* at 153.

Here, the parties do not dispute what Student's medical treatment should be; APS has properly left that determination to Parents and Student's treating physicians. *See* 20 U.S.C. § 1412(a)(25)(A) (states must prohibit school districts from requiring a child to obtain prescription medication as a condition of offering the child services under the IDEA); 34 C.F.R. § 300.174(A) (same); (*see also* Doc. 12-6 at 42 (Nurse Mak "didn't agree or disagree" with Mother regarding her decision to use cannabis as Student's rescue medication); Doc. 24 at 3 ("APS does not question the decision of [Parents] to administer cannabis to [Student].").) And certainly, there is no dispute regarding Parents' ability to regulate communications between school nursing staff and Student's treating physicians; there is no suggestion in the record that Parents have ever tried or desired to do so. *John A.*, 929 A.2d at 152. Rather, the parties in this case dispute, *inter alia*, whether it was proper for APS to "refuse[] flatly to administer the medications [at issue] under any circumstances," and whether Student "needed the medications to benefit from her special education." *Id.* at 153. The *John A.* decision specifically acknowledged that a due process hearing officer would likely have jurisdiction over such a dispute, and thus actually supports the DPHO's exercise of jurisdiction in this case. *Id.* In short, because the present controversy concerns Student's educational placement and the nature of the FAPE to which she is entitled under the IDEA, the Court finds that the DPHO properly exercised subject matter jurisdiction over Parents' Request.

2.     The DPHO erred by concluding that APS failed to offer Student a FAPE for preschool but correctly concluded that APS denied Student a FAPE for kindergarten and properly ordered APS to offer Student homebound services.

APS next claims that the DPHO erred in concluding that APS denied Student a FAPE and ordering APS to offer Student homebound services.  (Doc. 15 at 20-28.)  APS makes several arguments in support of this claim, specifically, that: (a) the IDEA does not require it to participate in or accommodate a violation of federal law; (b) relief that requires APS to accommodate illegal substance use violates the Spending Clause; (c) APS provided Student with a FAPE; (d) Parents did not request homebound services; and, (e) accommodating the administration of cannabis to Student could jeopardize APS' federal funding and render its personnel criminally liable as conspirators or accessories.

Regarding APS' first two arguments, again, the Court agrees that the IDEA cannot require APS to administer or accommodate the administration of cannabis to Student.  21 U.S.C. § 812(b)(1) & Sch. I; *Gonzales*, 545 U.S. at 14.  To summarize, it would be absurd to interpret the IDEA as requiring APS to commit or accommodate a federal crime to satisfy its obligation to provide Student with a FAPE.  *Pub. Citizen*, 491 U.S. at 454.  In addition, because the IDEA does not unambiguously require states to offer students services that violate federal law, the Spending Clause prevents the Court from reading this requirement into the statute.  *Rowley*, 458 U.S. at 207 n.26; *Nielsen*, 139 S. Ct. at 971.  Further, by operation of the CSA, the administration of cannabis cannot be considered medically necessary *under federal law*, 21 U.S.C. § 812(b)(1) & Sch. I, and is thus excepted from being a related service that APS must provide as part of a FAPE under the IDEA.  *Irving Indep. Sch. Dist.*, 468 U.S. at 894; *WildEarth Guardians*, 703 F.3d at 1189.

Nevertheless, having received the entire administrative record and having accorded due weight to the DPHO's factual findings, *Garcia*, 520 F.3d at 1125, the Court finds that APS did

offer Student the requisite FAPE for preschool but failed to do so for kindergarten. APS does not dispute that at all relevant times Student was eligible for services under the IDEA and that it was therefore obligated to offer her a FAPE. *Endrew F.*, 137 S. Ct. at 993; *Fry*, 137 S. Ct. at 749; *Sytsema*, 538 F.3d at 1312; *L.B. ex rel. K.B.*, 379 F.3d at 974. Further, the law prohibits APS from requiring Parents to obtain prescription medication for Student as a condition of offering her services under the IDEA. 20 U.S.C. § 1412(a)(25)(A); 34 C.F.R. § 300.174(A); N.M. Admin. Code § 6.31.2.8(J); *see J.Y. ex rel. E.Y. v. Dothan City Bd. of Educ.*, No. 1:12-CV-347-SRW, 2014 WL 1320187, at *6 n.14 (M.D. Ala. Mar. 31, 2014) ("[T]he IDEA expressly precludes an educational agency from requiring that a child obtain a prescription for a controlled substance as a condition of receiving an evaluation or services."); *Valerie J. v. Derry Co-op. Sch. Dist.*, 771 F. Supp. 483, 490 (D.N.H.), *clarified*, 771 F. Supp. 492 (D.N.H. 1991) (student's "right to a [FAPE] could not be premised on the condition that he be medicated without his parents' consent"). Thus, Parents were entitled to decline to provide Student's school with prescription medication to treat Student's seizure disorder, and APS was required to offer Student a FAPE that allowed for this circumstance. Stated another way, although APS was not obligated to offer Student a FAPE that accommodated Mother's administration of cannabis to her, it *was* obligated to offer her a FAPE that accommodated her seizure disorder without prescription medication.

Regarding preschool, the Court finds that the DPHO clearly erred in concluding that APS required Mother to be on campus pursuant to Student's March 2017 IEP.[31] (Doc. 12-1 at 405,

---

[31] The DPHO characterized this conclusion as one of law. (Doc. 12-1 at 409-10.) However, it appears to the Court to be, if not a factual finding, then at least a mixed question of law and fact requiring "primarily . . . factual work" to answer. *See U.S. Bank Nat. Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, — U.S. —, 138 S. Ct. 960, 967 (2018) ("[T]he standard of review for a mixed question [of law and fact] all depends—on whether answering it entails primarily legal or factual work."). As such, the Court will consider the issue giving due weight to the DPHO's factual findings and treating them as *prima facie* correct. *Garcia*, 520 F.3d at 1125.

410.)  Rather, as explained below, substantially more than a preponderance of the evidence establishes that Mother, in consensus with other IEP team members, considered homebound services for Student but ultimately preferred for her to go to school, and freely chose to accompany Student so that she could attend preschool and still have prompt access to cannabis in the event of a seizure.

The evidence suggesting that APS required Mother to accompany Student to preschool, in the sense of compelling her to do so against her own preference, is indirect and consists solely of Mother's testimony.[32]  Specifically, Mother testified that she requested homebound services, but that "someone" at the March 2017 IEP meeting "said she needed to try school before they went to homebound."  (Doc. 12-7 at 45.)  In addition, Mother testified that, at the March/April 2018 IEP meeting, she told Ms. Oliphant, "I sought out homebound and you guys denied it."  (*Id.* at 57.) Finally, Mother testified that it was an APS employee who suggested she should accompany Student to preschool.  Even accepting all of this testimony as true, it fails to show that Mother was unwilling for Student to "try school before . . . homebound," (*id.* at 45), or to accompany Student to preschool so that she could do so and still have prompt access to cannabis in the event of a seizure.

In contrast, there is substantial, definite, and direct evidence that Mother was not only willing but also ultimately preferred for Student to "try school," (*id.*), and therefore chose to accompany her.  Ms. Odegard, for example, testified that Mother "did want [Student] to go to school," (Doc. 12-6 at 17-18); and, Ms. Barrett testified that Mother was told homebound services were available to Student, but Mother "wanted [Student] in school; and the committee was doing

---

[32] The DPHO implicitly recognized the equivocal nature of this evidence by qualifying her findings and conclusions to the effect that Student's IEP required Mother to be on campus.  For example, in one instance she described Mother's presence on campus as a "*de facto* requirement," and in another instance she found that it was "not a requirement . . . *per se*, maybe more of the only alternative given the options."  (Doc. 12-1 at 405, 410.)

their best to find a way for [Student] to participate, and [Mother] was as well." (Doc. 12-6 at 68, 70.) Further, Mother herself explained why she would prefer for Student to attend school if feasible, *i.e.*, because socialization is important for the development of Student's social and language skills.[33] (Doc. 12-7 at 60-61.) Finally, there is the significant fact that, on the date of the March 2017 IEP meeting, Mother completed a "Consent for Initial Special Education Services," on which she indicated that she agreed with the IEP team's recommendations and gave permission for Student to receive the recommended services. (Doc. 12-4 at 102.) For all of these reasons, the Court finds that the plan for Mother to accompany Student to preschool was not a requirement, but rather a choice Mother made to effectuate the IEP team's mutual preference for Student to attend preschool and also accommodate her own preference for Student to have access to cannabis.

This finding, in turn, negates Parents' argument that Student's March 2017 IEP did not offer her a FAPE because it was not free. (Doc. 20 at 1-4, 19.) Under the IDEA, a FAPE must be free, *i.e.*, "provided at public expense, under public supervision and direction, and without charge." 20 U.S.C. § 1401(9)(A); *see Knable ex rel. Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 769 (6th Cir. 2001) (proposed IEP did not offer student a FAPE where it imposed costs on parents). Parents argue that Student's educational program was not free because it *required* Mother to accompany Student to school every day and therefore imposed a charge on the family.[34] (Doc. 20 at 1-4, 19); 20 U.S.C. § 1401(9)(A).

---

[33] The record evidence supports the inference that it *was* feasible for Mother to accompany Student to preschool. Student's IEP called for her to attend preschool only one hour per day; and, though Student often ended up staying for the full two-and-a-half-hours per day, she missed one or two days per week and still made good educational progress. (Doc. 12-3 at 96; Doc. 12-6 at 39, 62; Doc. 12-7 at 45-46, 48.)

[34] Parents wisely refrain from arguing that homebound services would not be free because Mother would have to be home while Student receives them. (Doc. 12-7 at 61.) Beyond the readily apparent practical and philosophical differences between requiring a person to stay at home and requiring that person to stay at her child's school on a

As a matter of first impression, the Court holds that an IEP remains free within the meaning of the IDEA notwithstanding a parent's voluntary decision to accompany her child to school to provide services the school cannot legally provide, to effectuate the parent's and the school district's mutual preference for the child to attend school in lieu of receiving homebound services. As previously discussed, the great weight of the evidence in this case establishes that Mother preferred for Student to attend preschool and chose to accompany her (with APS' agreement) so that she could do so and still have prompt access to cannabis in the event of a seizure. Nothing in the IDEA required APS to either overrule Mother's choice in these specific circumstances or to be financially responsible for it.

In so holding, the Court is mindful of the *Sytsema* decision, in which the Tenth Circuit held that, "[w]hen analyzing the substantive compliance of an IEP, the [c]ourt should restrict [its] examination to the written document." 538 F.3d at 1316. The plan for Mother to accompany Student to preschool to remove her from campus and give her cannabis in the event of a seizure was omitted from the written documents memorializing Student's March 2017 IEP. (*See generally* Doc. 12-3 at 87-97.) Thus, at first glance, it appears that the Court should not consider this plan in reviewing whether the IEP offered Student a FAPE. However, the Court finds the circumstances in *Sytsema* to be distinguishable from the unusual circumstances of this case.

In *Sytsema*, the school district asked the court to consider the substantive compliance not only of the student's draft IEP, but also of its subsequent oral offers to increase the number of service hours it would provide, which offers were never accepted or implemented. 538 F.3d at

---

regular basis, the IDEA and its implementing regulations expressly provide that home instruction is part of the continuum of alternative placements states must make available to disabled students under the IDEA. 20 U.S.C. § 1401(29); 34 C.F.R. § 300.115; *see also R.L. v. Miami-Dade Cty. Sch. Bd.*, 757 F.3d 1173, 1185 (11th Cir. 2014) ("The IDEA clearly contemplates that a state might be required to place a student in one-on-one homebound instruction to meet the student's needs.").

1309-10, 1315. The Tenth Circuit declined to consider the district's subsequent oral offers, reasoning that "[t]he requirement of a formal, written offer creates a clear record that will do much to eliminate troublesome factual disputes many years later about the specifics of the offer." *Id.* at 1316 (brackets omitted). In addition, the *Sytsema* court explained that, "given [its] own hesitancy to analyze the substantive deficiencies of an oral offer," it was "reluctant to require parents to make a similar judgment regarding a proposed IEP without a final written offer." *Id.*

Here, however, the plan for Mother to accompany Student to preschool to remove her from campus and give her cannabis in the event of a seizure was not merely an inchoate oral offer. Rather, it was an integral part of the proposal that Student's March 2017 IEP team actually accepted, and that APS and Parents subsequently and fully implemented. Mother did accompany Student to preschool; and, Parents did remove Student from campus and Mother gave her cannabis when she had a seizure. There are no "troublesome factual disputes" about the specifics of the plan, and Parents' active participation shows that they understood it well enough to judge its adequacy. *Id.* Indeed, the parties do not even dispute why the plan was omitted from Student's written IEP and PWN, though they have previously disagreed regarding the propriety of the omission.[35] Specifically, both sides recognize that the only reason Mother accompanied Student to preschool was to give her cannabis in the event of a seizure; and, APS deliberately "avoided the mention of cannabis in [Student's] IEP" in light of the drug's illegal status. (Doc. 24 at 6.)

In these circumstances, the Court finds the *Sytsema* holding inapplicable. The *Sytsema* court prohibited consideration of oral offers that were never accepted, not oral offers that were

---

[35] The DPHO concluded that Student's PWNs "did not mention the need for Parent to be on campus in the event of a seizure and were incomplete in that respect," but that these "[p]rocedural errors were not serious enough to result in a denial of FAPE." (Doc. 12-1 at 410-11.)

accepted and implemented, and certainly not oral offers that were a universally acknowledged and integral part of an IEP but were deliberately omitted from the documentation. The latter type of offer presents a problem quite distinct from those the *Sytsema* court wished to avoid, specifically, the risk of misjudging the adequacy of the IEP a student actually received by ignoring a crucial part of it. The Court finds that it would be improper to ignore a part of Student's IEP that the team actually accepted and implemented solely because APS decided not to document it. Thus, the Court will consider the plan for Mother to voluntarily accompany Student to preschool to give her cannabis as needed in its review of Student's March 2017 IEP; and, for the reasons previously discussed, the Court finds that Parents did not meet their burden of proving that the IEP denied Student a FAPE for preschool.

However, the Court agrees with the DPHO that Parents did meet their burden of proving that APS failed to offer Student a FAPE for kindergarten in violation of the IDEA. Specifically, a preponderance of the record evidence shows that: (a) the IEP team considered but rejected homebound services for Student's kindergarten year[36]; (b) Parents declined to provide the school with prescription medication to give Student in the event of a seizure; (c) Mother declined to accompany Student to full-day kindergarten to administer treatment in the event of a seizure; (d) APS nevertheless proposed that Student attend full-day kindergarten at her neighborhood school; (e) pursuant to this proposal, the school would have had no way to provide or obtain prompt treatment for Student's life-threatening seizures; and, (f) the proposal would therefore have put

---

[36] APS' argument that the DPHO erred in finding that Mother requested homebound services for Student at the March/April 2018 IEP meeting is beside the point. (Doc. 1 at 6; Doc. 12-1 at 397.) It is undisputed that the March/April 2018 IEP team considered homebound services and rejected them. (Doc. 12-3 at 197.) Moreover, it appears highly likely that Mother would have accepted homebound services had they been offered, in light of the fact that, at the time of the due process hearing, she was trying to homeschool Student but was "not equipped to teach her." (Doc. 12-7 at 50, 56-57.)

Student's life or health at unreasonable risk. (*See, e.g.*, Doc. 12-7 at 50 (Mother testified that sending Student to school without access to rescue medications would "basically put her life on the line").)

As discussed in Section II.B., *supra*, a FAPE must be "reasonably calculated to enable the child to receive educational benefits." *Endrew F.*, 137 S. Ct. at 995-96; *Garcia*, 520 F.3d at 1125. An educational program that puts a student's life or health at unreasonable risk does not satisfy this standard. It is disturbingly obvious but nonetheless bears stating that, if Student were to die or require hospitalization due to delayed treatment of a seizure, she would be unable to receive educational benefits from her IEP. *Id.* Moreover, to the extent APS argues that Parents could have mitigated the risk by providing the school with prescription medication or accompanying Student to kindergarten, first and foremost, the Court finds that neither of these plans was included in the March/April 2018 IEP the team accepted. Parents declined to provide the school with prescription medication; Mother declined to accompany Student to kindergarten; and, there is no indication in the record that APS included either plan in Student's IEP over Parents' objection.

Moreover, even if APS had tried to, the law would have prohibited it from compelling Parents to either provide Student's school with prescription medication or accompany Student to kindergarten. As previously noted, APS may not require Parents to obtain prescription medication for Student as a condition of offering her services under the IDEA. 20 U.S.C. § 1412(a)(25)(A); 34 C.F.R. § 300.174(A); N.M. Admin. Code § 6.31.2.8(J); *J.Y. ex rel. E.Y.*, 2014 WL 1320187, at *6 n.14; *Valerie J.*, 771 F. Supp. at 490. And, as a matter of first impression, the Court agrees with Parents that to compel Mother to accompany Student to school over her objection would be to impose a substantial financial burden, and therefore a "charge," on the family in violation of the IDEA's mandate that a FAPE be free. *Knable ex rel. Knable*, 238 F.3d at 769. It is one thing for

36

APS to have accepted Mother's volunteer services when she freely offered them, but would be quite another for the district to try to compel them. For these reasons, the Court finds that Parents have shown that APS failed to offer Student a FAPE for her kindergarten year and will affirm the DPHO's findings of fact and conclusions of law to that effect.

The Court will also affirm the DPHO's order requiring APS to offer Student homebound services with the opportunity for limited school attendance at Parents' option for her kindergarten year. (Doc. 12-1 at 410-11.) The Court agrees with the DPHO's conclusion that the homebound setting with optional socialization opportunities would provide Student with a FAPE in the LRE for kindergarten. This setting would allow Student to receive special education and related services at public expense and preserve her access to prompt treatment for seizures without impermissibly compelling Parents to either provide APS with prescription medication or accompany her to school.[37] 20 U.S.C. §§ 1401(9)(A), 1412(a)(25)(A); 34 C.F.R. § 300.174. Moreover, neither side has identified any other viable plan that would offer Student a FAPE meeting these criteria.

APS argues that the DPHO nevertheless erred in ordering it to offer Student homebound services because Parents did not request homebound services. (Doc. 15 at 23-26.) This argument is both factually inaccurate and legally unfounded. The argument is factually inaccurate because Parents did request homebound services at various times. For example, Mother requested homebound services from Ms. Odegard in the fall of 2016; and, Parents requested homebound

---

[37] The DPHO's order gave Parents the ability to choose whether to limit Student's kindergarten education to homebound services or also send her to school a few hours per week for peer interaction. (Doc. 12-1 at 411-12 (requiring APS to "offer[]" Student "[s]ome additional time" at school).) As such, it gave Parents the ability to choose whether to place Student in circumstances in which Mother would choose to accompany her to preserve her access to cannabis in the event of a seizure. (*See id.* ("Mother may attend school during these . . . times, at her option, but she is not required to.").)

services with socialization opportunities in the Proposed Findings of Fact and Conclusions of Law they submitted to the DPHO on October 2, 2018.

The argument is legally unfounded because the IDEA does not necessarily limit the relief a due process hearing officer can award to the relief a party proposes at a given stage of the administrative process. *Cf. Garcia*, 520 F.3d at 1128 (IDEA "confers broad discretion on the court" in fashioning equitable relief). In particular, while it is true that Parents did not propose homebound services with socialization opportunities in their Request, the IDEA did not require them to do so. It did require them to include in their Request "a proposed resolution of the problem to the extent known and available to [them] at the time." 20 U.S.C. § 1415(b)(7)(A)(IV); 34 C.F.R. § 300.153. However, the record shows that Parents did not know APS could provide homebound services with socialization opportunities until the due process hearing, when Ms. Soo Hoo testified that APS had provided another student with similar hybrid services. In short, the Court will not rule out a viable FAPE ordered by the DPHO simply because Parents did not know to propose it at the initial stage of the administrative process.

The Court is not persuaded by APS' argument that the DPHO erred in ordering it to offer Student homebound services because complying with the DPHO's order would jeopardize its federal funding and subject its personnel to the risk of criminal prosecution. (Doc. 15 at 21-22; Doc. 24 at 3.) APS hypothesizes that if it provides homebound services to Student, one of its staff members could be in Student's home providing services when Mother administers cannabis to Student to stop a seizure. According to APS, if this were to occur, it could lose its federal funding, and its staff member could be criminally prosecuted as a conspirator or an accessory.

Regarding the first point, APS contends that it could lose its federal funding in this hypothetical situation pursuant to the federal Drug-Free Workplace Act, 41 U.S.C. §§ 8101 *et seq.* ("DFWA").  The DFWA defines a "[d]rug-free workplace" as

> a site of an entity—
>
> (A) for the performance of work done in connection with a specific contract or grant . . . ; and
>
> (B) at which *employees* of the entity are prohibited from engaging in the unlawful manufacture, distribution, dispensation, possession, or use of a controlled substance . . . .

41 U.S.C. § 8101(a)(5) (emphasis added); *see also* 34 C.F.R. § 84.635 ("Drug-free workplace means a site for the performance of work done in connection with a specific award at which *employees* of the recipient are prohibited from engaging in the unlawful manufacture, distribution, dispensing, possession, or use of a controlled substance.") (emphasis added).

The DFWA requires a federal funding recipient to:  (1) publish a statement notifying *its employees* that "the unlawful manufacture, distribution, dispensation, possession, or use of a controlled substance is prohibited in the grantee's workplace," which it must give its employees and with which they must comply as a condition of employment; (2) establish a "drug-free awareness program" for *its employees*; (3) notify the granting agency of any *employee's* criminal drug statute conviction; (4) impose a sanction on any *employee* so convicted or require the employee to participate in drug treatment; and, (5) make a good faith effort to maintain a drug-free workplace *by taking the foregoing steps*.  41 U.S.C. § 8103(a).

From these provisions it is clear that the DFWA obligates APS to take specific steps to prevent *its employees* from engaging in the unlawful manufacture, distribution, dispensation, possession, or use of a controlled substance.  It does not obligate APS to take steps to prevent students or their families from engaging in any of the prohibited acts.  APS is therefore in no

danger of losing its federal funding pursuant to the DFWA due to Mother's actions. Moreover, an APS employee who merely sees Mother give Student cannabis has not engaged in any of the acts the DFWA prohibits; he has not, in other words, manufactured, distributed, dispensed, possessed, or used cannabis. Thus, APS is in no danger of losing its federal funding pursuant to the DFWA due to his actions, either. For these reasons, the Court concludes that providing Student with homebound services will not jeopardize APS' federal funding pursuant to the DFWA.[38]

Regarding the second point, the Court concludes that an APS staff member would not be subject to criminal prosecution as a conspirator or an accessory in the hypothetical event that he is providing services in Student's home when Mother gives Student cannabis to stop a seizure. (Doc. 15 at 22; Doc. 24 at 3.)

> To prove a criminal conspiracy, the government must show: (1) an agreement with another person to violate the law; (2) knowledge of the essential objectives of the conspiracy; (3) knowing and voluntary involvement; and (4) interdependence among the alleged conspirators.

*United States v. Keck*, 643 F.3d 789, 793 (10th Cir. 2011).

> [P]roof is not sufficient if it merely shows that the defendant knew about the existence of the conspiracy or was associated with members of the conspiracy. Rather, the evidence must show the defendant knowingly joined the conspiracy with the intent to advance its purposes.

10th Cir. Crim. Pattern Jury Instruction 2.87 (2011 ed., updated Feb. 2018).

With the exception of knowledge regarding Mother's objectives, APS' hypothetical satisfies none of the elements required to sustain a conspiracy conviction. Without more, an APS staff member who sees Mother give Student cannabis while he is in the home providing IDEA-mandated special education or related services has not agreed to Mother giving Student cannabis.

---

[38] APS also argues that providing Student with homebound services could jeopardize its federal funding pursuant to the IDEA, but it fails to provide any reasoned basis for this argument. (*See generally* Doc. 15 at 21-22; Doc. 24 at 3.)

He is not voluntarily involved with it. He and Mother are not interdependent with respect to it. He has no intent to advance it. Rather, he merely has knowledge of it, which is insufficient to sustain a conviction. *Id.*

Similarly, APS' hypothetical fails to satisfy the elements of aiding and abetting, which are that "the defendant: (1) "willfully associated with [a] criminal venture, and (2) aided such venture through affirmative action." *United States v. Delgado-Uribe*, 363 F.3d 1077, 1084 (10th Cir. 2004) (brackets and quotation marks omitted). "[M]ere presence at a crime scene is insufficient to prove aiding and abetting," and "[a]lthough knowledge a crime is being committed is relevant, some showing of intent to further the criminal venture must be introduced at trial." *Id.* Without more, however, APS' hypothetical staff member has not willfully associated with Mother's administration of cannabis to Student, has taken no affirmative action to aid it, and has no intent to further it. Rather, at most, he is merely present with knowledge that a crime is being committed, which is insufficient to sustain an aiding and abetting conviction. *Id.*

Finally, APS' hypothetical situation fails to satisfy all of the elements of being an accessory after the fact under 18 U.S.C. § 3, or of misprision of a felony under 18 U.S.C. § 4. To prove a violation of 18 U.S.C. § 3, the prosecution must show:

> First: the defendant knew someone else had already committed [a crime].
>
> Second: the defendant then helped that person try to avoid being arrested, prosecuted or punished.
>
> Third: the defendant did so with the intent to help that person avoid being arrested, prosecuted or punished.

10th Cir. Crim. Pattern Jury Instruction 2.07.

Similarly, to prove a violation of 18 U.S.C. § 4, the prosecution must show:

> First: a federal felony was committed . . . ;

Second: the defendant had knowledge of the commission of that felony;

Third: the defendant failed to notify an authority as soon as possible. . . ; and

Fourth: the defendant did an affirmative act, as charged, to conceal the crime.

10th Cir. Crim. Pattern Jury Instruction 2.08. "Mere failure to report a felony is not a crime. The defendant must commit some affirmative act designed to conceal the fact that a federal felony has been committed." *Id.*

Again, without more, APS' hypothetical situation fails to satisfy these elements. APS' hypothetical staff member has done nothing to help Mother avoid arrest, prosecution, or punishment and has evidenced no intent to do so. Nor has he committed any affirmative act designed to conceal Mother's administration of cannabis to Student. At most, he merely knows of and has failed to report it, which is insufficient to sustain a conviction of either offense. In sum, APS has failed to identify any crime for which a staff member could plausibly be prosecuted if he saw Mother give Student cannabis while he was in the home providing services. The Court therefore finds that APS and its staff members are not at risk of losing federal funding pursuant to the DFWA or being criminally prosecuted for providing homebound services to Student, and that the DPHO properly ordered APS to offer Student such services with socialization opportunities for kindergarten.

### III.  Conclusion

For the reasons set forth above, (1) the Decision is REVERSED to the extent the DPHO concluded that APS failed to offer Student a FAPE for preschool; and, (2) the Decision is AFFIRMED to the extent the DPHO concluded that APS failed to offer Student a FAPE for kindergarten and ordered APS to offer Student homebound services with optional socialization opportunities for her kindergarten year.

IT IS SO ORDERED.

_____
KIRTAN KHALSA
UNITED STATES MAGISTRATE JUDGE
Presiding by Consent